IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CRAIG GABALDON,

      **Plaintiff,**

v.                                                                                                  CV. No. 23-00035 JCH/SCY

NEW MEXICO STATE POLICE,
KEVIN SMITH,
In his individual capacity,
KURTIS WARD,
In his individual capacity, and
JOHN DOES 1 through 4,

      **Defendants.**

## MEMORANDUM OPINION AND ORDER

### I.     INTRODUCTION

This case arises from Defendant, Officer Kevin Smith's arrest of Plaintiff, Craig Gabaldon, on the evening of January 29, 2021. Officer Smith suspected that Mr. Gabaldon was driving while intoxicated, in violation of NMSA 1978, § 66-8-102(D). Officer Smith proceeded to stop Mr. Gabaldon and with the help of Lieutenant Kurtis Ward who had arrived as backup, used force to restrain and arrest Mr. Gabaldon.[1] Mr. Gabaldon sued Officer Smith, Lieutenant Ward, and the New Mexico State Police (collectively, "State Defendants"), alleging violations of his Fourth, Fifth, and Fourteenth Amendment rights (among other claims).[2] State Defendants then filed *State Defendants' Motion for Partial Summary Judgment on Plaintiff's Fourth, Fifth, and Fourteenth Amendment Claims* **(ECF No. 44)**. Mr. Gabaldon filed his response **(ECF No. 59)** and State

---

[1] At the time of Mr. Gabaldon's arrest, Lieutenant Ward was a sergeant. For purposes of this decision, the Court will refer to Lieutenant Ward by his current title.

[2] Defendants John Does 1 through 4 were dismissed from this case pursuant to the Court's Order Adopting Findings and Recommendation (ECF No. 20).

Defendants replied **(ECF No. 65)**. In State Defendants' reply, they argued that the affidavit submitted by Mr. Gabaldon in his response was a sham affidavit. *See* Defs.' Reply 3-6, ECF No. 65. The Court permitted Mr. Gabaldon to file a sur-reply addressing only the issue of the sham affidavit **(ECF No. 83)**. Having considered the motion, briefs, arguments, applicable law, and otherwise being fully advised, the Court concludes that the motion for summary judgment should be granted on the basis of qualified immunity. The Court will first address the argument that Mr. Gabaldon's affidavit is a sham affidavit and will then address the argument for summary judgment based on qualified immunity.

## II.    DISCUSSION OF SHAM AFFIDAVIT

To start, State Defendants argue that Mr. Gabaldon's affidavit creates a sham fact issue and should be excluded from the Court's consideration of the motion for summary judgment. Because a decision on summary judgment depends on the existence of a genuine issue of a material fact, and because Mr. Gabaldon's affidavit disputes several material facts, the Court first must determine whether it is, in fact, a sham affidavit that should be excluded.

Although "unusual," sham affidavits are affidavits that contradict the affiant's prior sworn statements, submitted by a party in an attempt to create a false factual issue. *See Law Co. v. Mohawk Constr. & Supply Co.*, 577 F.3d 1164, 1169 (10th Cir. 2009). While contradictions in a witness's testimony do not alone justify precluding that testimony, sham affidavits pose different considerations. *See Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 973 (10th Cir. 2001). If a trial court determines that an affidavit was submitted in order to create a false factual issue, the court may exclude the affidavit in considering a motion for summary judgment. *See id.*; *see also Scott v. Harris*, 550 U.S. 372, 380 (2007). The Tenth Circuit has justified this result, stating that "the utility of summary judgment as a procedure for screening out sham fact issues would be

greatly undermined if a party could create an issue of fact merely by submitting an affidavit contradicting his own prior testimony." *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986).

To determine whether an affidavit is indeed a sham affidavit, courts consider three factors: (1) whether the affiant was cross-examined during their earlier testimony; (2) whether the affiant had access to the pertinent evidence at the time of their earlier testimony, or whether the affidavit was based on newly discovered evidence; and (3) whether the earlier testimony reflects confusion which the affidavit attempts to explain. *See id.*; *Ralston*, 275 F.3d at 973 (quoting *Rios v. Bigler*, 67 F.3d 1543, 1551 (10th Cir. 1995)). "When consideration of these factors leads to the conclusion that the subsequent affidavit constitutes an attempt to create a 'sham fact issue,' the court does not abuse its discretion in disregarding the affidavit and relying instead on the prior deposition testimony in deciding a summary judgment motion." *King v. Estate of Gilbreath*, 215 F. Supp. 3d 1149, 1160 (D.N.M. 2016).

There are three dates relevant to the Court's assessment of Mr. Gabaldon's affidavit. The parties first took Mr. Gabaldon's deposition on October 19, 2023. *See generally* Dep. of Craig Gabaldon, ECF Nos. 65-1, 57-1, 83 (hereinafter "Pl.'s Dep."). Mr. Gabaldon filed a response to the motion for summary judgment at issue here on January 25, 2024. *See generally* Pl.'s Resp., ECF No. 59. Attached to his response was an affidavit he executed the day before, on January 24, 2024. *See generally id.*, Ex. 1, ECF No. 59-1 (hereinafter "Pl.'s Aff."). His affidavit contradicts the testimony he gave in the October 19, 2023, deposition in the following instances:

(1) In his deposition, Mr. Gabaldon testified that he did not remember turning onto Candelaria Road, just that he turned right. *See* Pl.'s Dep. 65:11-18. However, in his affidavit he denies all the traffic violations that Officer Smith claims he witnessed while Mr. Gabaldon was turning right onto Candelaria Road. *See* Pl.'s Aff. ¶¶ 2-9.

(2) In his deposition, Mr. Gabaldon testified that he did not remember how fast he was driving on Candelaria Road or what the speed limit was, but that he assumed he was going the speed limit. *See* Pl.'s Dep. 69:12-17. But in his affidavit, he denies ever exceeding the posted speed limit during the events at issue. *See* Pl.'s Aff. ¶ 4.

(3) In his deposition, Mr. Gabaldon testified that he did not remember making the turn from Candelaria Road onto Adams Street. *See* Pl.'s Dep. 69:18-24. However, in his affidavit he claims he used his motorcycle's turning signal when he turned onto Adams Street. *See* Pl.'s Aff. ¶ 5.

(4) In his deposition, Mr. Gabaldon first testified that he did not remember when he stopped drinking alcohol. *See* Pl.'s Dep. 73:6-11. He then testified that the last time he drank alcohol was in September 2023, about one month before the deposition. *Id.* at 75:17-22. However, in his affidavit he testified that he stopped drinking alcohol four months prior to his arrest, which would have been September 2020, and that he has not consumed alcohol since. *See* Pl.'s Aff. ¶ 7.

(5) Finally, in his deposition, Mr. Gabaldon testified that he did not know why Officer Smith stopped him on the evening in question and could not say it was because he was wearing a Bandidos Motorcycle Club ("Bandidos") patch. *See* Pl.'s Dep. 123:7-20. But in his affidavit, he testified that he believes he was stopped by Officer Smith because of his Bandidos patch and his affiliation with the Club. *See* Pl.'s Aff. ¶ 7.

Consideration of these inconsistencies and the three factors outlined in *Franks* leads this Court to the conclusion that the affidavit attempts to create a sham issue of fact and should be excluded.

First, there is no question that Mr. Gabaldon was represented by counsel and cross-examined during his deposition. *See* Pl.'s Dep. 157:2-4.

Consideration of the second *Franks* factor is more involved. Mr. Gabaldon argues that the second *Franks* factor supports the inclusion of the affidavit because the affidavit was based on new evidence—that is, video of the events at issue from Officer Smith's dashcam and lapel camera, and Lieutenant Ward's dashcam (submitted as exhibits B, E and F). *See* Sur-reply 9, ECF No. 83. Mr. Gabaldon alleges that he was not shown this footage before his deposition. *See id.* Therefore, his affidavit is based on his review of this footage that he had not seen previously, which refreshed his memory as to the events at issue. *See id.*

Assuming, *arguendo*, that the video footage did refresh Mr. Gabaldon's memory about the arrest, the Court would expect the affidavit to reflect what is visible in the video. But the video footage does not support the version of events Mr. Gabaldon recites in his affidavit. This is evident upon further inspection of the inconsistencies outlined above:

(1) Mr. Gabaldon recalls in his affidavit that he did not commit any traffic violations while making the turn onto Candelaria Road. *See* Pl.'s Aff. ¶¶ 2-9. However, Mr. Gabaldon's full turn onto Candelaria Road is not visible in any of the video footage. *See* Dashcam Video 00:40-00:52.

(2) Mr. Gabaldon recalls in his affidavit that he did not exceed the speed limit at any point. *See* Pl.'s Aff. ¶ 4. But the video footage does not show exactly how fast Mr. Gabaldon was driving on Candelaria Road (although, it appears to the naked eye that he is driving quite fast). *See* Dashcam Video 00:59-1:25.

(3) Mr. Gabaldon claims to have used his motorcycle's turning signal while making the turn onto Adams Street. *See* Pl.'s Aff. ¶ 5. But the dashcam video does not show Mr. Gabaldon using any kind of signal before making the turn. *See* Dashcam Video 1:20-1:27.

(4) Mr. Gabaldon recalls that he became sober approximately four months prior to the traffic stop and has not consumed alcohol since. *See* Pl.'s Aff. ¶ 7. But there is nothing in the video footage that would help Mr. Gabaldon remember the correct date he became sober.

(5) Mr. Gabaldon asserts that Officer Smith pulled him over because his clothing expressed his affiliation with the Bandidos. *See id.* But nothing in the video explains why Mr. Gabaldon would have suddenly remembered why he believed Officer Smith pulled him over.

So, while the Court acknowledges that Mr. Gabaldon may have not had access to this video footage before his deposition, the video footage does not logically support the changes Mr. Gabaldon made to his testimony in his affidavit. The Court is not convinced that consideration of the second *Franks* factor supports the inclusion of the affidavit.

Finally, the Court considers the third *Franks* factor. Mr. Gabaldon's testimony from the October 19, 2023, deposition does not reflect confusion; Mr. Gabaldon responded "yes" when asked if he understood all of opposing counsel's questions at the deposition, and "no" when asked if there was anything about the testimony he would like to change or correct. *See* Pl.'s Dep. 156:17-22. Rather, his testimony reflects forgetfulness; Mr. Gabaldon responded to several questions stating that he did not know the answer or could not remember. *See King v. Estate of Gilbreath*, 215 F. Supp. 3d 1149, 1161-62 (D.N.M. 2016) (finding inconsistencies between prior deposition testimony that affiant had no personal knowledge of operations during disputed time frame and affiant's affidavit claiming personal knowledge of operations during disputed time frame). In Mr.

Gabaldon's sur-reply, he points to several passages from his deposition where he could not remember the answer to a question and explained that he has poor memory. *See* Pl.'s Sur-reply 2-12. But the affidavit offers no explanation as to why Mr. Gabaldon now remembers the events that he previously could not recall. This is especially disconcerting considering Mr. Gabaldon stated in his deposition that his memory has been getting "worse instead of better." *See id.* at 8:24-25; *King*, 215 F. Supp. 3d at 1162 (taking issue with fact that affidavit made no attempt to explain contradictions between deposition and affidavit). And as noted previously, the video footage Mr. Gabaldon reviewed before the affidavit does not logically support the theory that it refreshed Mr. Gabaldon's memory. Accordingly, consideration of the third *Franks* factor weighs in favor of excluding the affidavit.

Moreover, the Tenth Circuit has observed that the timing and circumstances of an affidavit may also support its exclusion. *See Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 973 (10th Cir. 2001) (finding facts that affidavits were executed after plaintiff had narrowed case down to one cause of action, affidavits contradicted part of affiant's prior deposition that was detrimental to sole remaining cause of action, and affidavits were executed more than one year and a half after the deposition, supported exclusion of affidavits); *King*, 215 F. Supp. 3d at 1161 (excluding affidavit where affidavit was taken after opposing party moved for summary judgment and affiant had a direct stake in the outcome of the case). Here, the affidavit was executed on January 24, 2024, four months after Mr. Gabaldon's deposition was taken and only one day before Mr. Gabaldon's response to the motion for summary judgment at issue here was filed. *See id.* at 1162 (excluding affidavit based in part on fact that affidavit supporting response was taken two days before response was filed). Further, the affidavit contradicts the parts of Mr. Gabaldon's deposition that are detrimental to the remaining claims at issue in this motion—specifically, testimony

relating to whether Officer Smith could have had reasonable suspicion to conduct a traffic stop, probable cause to arrest Mr. Gabaldon, or justification in using force to arrest him. *See id.* (finding fact that affidavit was executed to support a key part of party's burden in responding to motion for summary judgment suspicious). Mr. Gabaldon's affidavit, if included, would create issues of material fact around his Fourth Amendment claims that previously did not exist. These suspicious circumstances support the Court's conclusion that this is a sham affidavit that should be excluded.

To be sure, the Court is aware that credibility judgments are improper in deciding motions for summary judgment and that doubts must be resolved in favor of Mr. Gabaldon as the nonmovant. However, the Court is not making an improper credibility judgment. Rather, it is carefully distinguishing between inconsistencies that create a sham issue of fact and those that pertain to credibility and the weight of the evidence. *See id.* (citing *Durtsche v. Am. Colloid Co.*, 958 F.2d 1007, 1011 n.2 (10th Cir. 1992)). Accordingly, Mr. Gabaldon's affidavit will be disregarded by the Court and the Court will rely on the testimony from his October 19, 2023, deposition in deciding State Defendants' motion for summary judgment.

## III.   LEGAL STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). In reviewing a summary judgment motion based on qualified immunity, as is the case here, the court views the evidence "in the light most favorable to the opposing party." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam) (citation omitted). "Because of the underlying purposes of qualified immunity, [the Tenth Circuit] review[s] summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions." *Medina v. Cram*, 252 F.3d 1124, 1128 (10th

Cir. 2001). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff, who must clear two hurdles in order to defeat the defendant's motion." *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009). That burden requires a plaintiff to show that the state official "(1) [] violated a federal statutory or constitutional right, and (2) the unlawfulness of [the official's] conduct was clearly established at the time." *District of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018) (internal quotations and citations omitted); *Pauly v. White*, 874 F.3d 1197, 1214 (10th Cir. 2017). "[The district court] may decide 'which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case.'" *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). "[I]f the plaintiff fails to establish either prong of the two-pronged qualified immunity standard, the defendant prevails on the defense." *A.M. v. Holmes*, 830 F.3d 1123, 1134-35 (10th Cir. 2016).

The events in this case were captured, at least in part, on Officer Smith's dashcam and lapel camera, and Lieutenant Ward's dashcam. In a case, such as this one, where there is a video recording capturing the events in question, a court should view the facts in the light depicted by the video recording. *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007). So, while courts must view facts and draw reasonable inferences in favor of the nonmovant, courts must not accept a version of the facts that is clearly discredited by the video footage. *Id.* at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.") "Hence, the 'principal purpose of assessing whether plaintiff's evidence gives rise to genuine issues of material fact' in the qualified-immunity context 'is to determine whether plaintiff's factual allegations are sufficiently grounded in the record such that

they may permissibly comprise the universe of facts that will serve as the foundation for answering the *legal* question before the court.'" *Tellez v. City of Belen*, 560 F. Appx. 812, 814 (10th Cir. 2014) (quoting *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1326 (10th Cir. 2009)). Consequently, the facts set forth in the next section are drawn from the undisputed evidence; the video recordings; and, for the facts not conclusively established in the video recording, those facts that are supported by admissible evidence and construed in the light most favorable to Mr. Gabaldon, the non-moving party.

## IV.    FACTUAL AND PROCEDURAL BACKGROUND

On January 29, 2021, Officer Smith observed Mr. Gabaldon riding his motorcycle northbound on Carlisle Boulevard in Albuquerque. *See* Dashcam Video 00:42-00:51. Officer Smith observed Mr. Gabaldon make a wide right turn onto eastbound Candelaria Road, crossing the double yellow lines into the westbound lane before correcting back into the proper lane.[3] *See* Defs.' Undisputed Material Facts ("UMF") ¶¶ 3-4, ECF No. 44. Officer Smith had just begun to pursue Mr. Gabaldon when he noticed Mr. Gabaldon rapidly accelerate on Candelaria Road. *See id.* at ¶ 5. Office Smith used his radar to confirm that Mr. Gabaldon was traveling 78 miles-per-hour in a 35 mile-per-hour zone. *See id.* Mr. Gabaldon then proceeded to turn right onto Adams Street. *See* Dashcam Video 1:27-1:29. Officer Smith did not see Mr. Gabaldon use his motorcycle's turn signal during this turn. *See* Defs.' UMF ¶ 6. Officer Smith caught up to Mr. Gabaldon once they were both on Adams Street and Officer Smith turned on his vehicle's emergency lights. *See* Dashcam Video 1:33-1:51. Mr. Gabaldon proceeded to turn into a driveway, dismount his motorcycle, and walk towards the residence. *Id.*; Defs.' UMF ¶ 14. Officer Smith

---

[3] Mr. Gabaldon testified that he did not remember making this turn. *See* Pl.'s Dep. 65:11-18. A party's inability to remember a fact is not the same as a party affirmatively disputing that fact. Accordingly, the Court accepts Officer Smith's recollection of this fact as undisputed. The Court takes this approach with several other facts that Officer Smith asserts but Mr. Gabaldon cannot remember.

exited his vehicle and verbally commanded Mr. Gabaldon to stop. *See* Lapel Video 1:55-2:23. Mr. Gabaldon complied, stopping next to his motorcycle and a vehicle parked to his left. *Id.* Officer Smith asked Mr. Gabaldon several times to move away from the vehicle and residence towards the street so the two could talk; Mr. Gabaldon did not comply. *See id.* at 2:27-3:38. Officer Smith informed Mr. Gabaldon that he observed Mr. Gabaldon speeding and driving into the wrong lane. *See id.* Officer Smith asked Mr. Gabaldon for his name and Mr. Gabaldon refused to share. *See id.* Mr. Gabaldon said, "Do what you want. I'm not going to say anything." *See id.* at 4:10-5:10. During these interactions, Officer Smith observed that Mr. Gabaldon smelled of alcohol, had bloodshot eyes, and was slurring his speech. *See* Defs.' UMF ¶ 29. Officer Smith then asked Mr. Gabaldon if he would submit to a field sobriety test but Mr. Gabaldon refused. *See* Lapel Video 4:10-4:30.

Based on these observations and Mr. Gabaldon's conduct, Officer Smith attempted to arrest Mr. Gabaldon for driving under the influence. *See* Defs.' UMF ¶ 32. Mr. Gabaldon initially resisted arrest by grabbing onto the side of the vehicle parked in the driveway. *See id* at ¶ 33. Officer Smith also noticed Mr. Gabaldon try grab for something on his left hip that appeared to be a knife.[4] *See id* at ¶¶ 34, 39. Finally, Officer Smith, with the help of Lieutenant Ward who had arrived on the scene, secured Mr. Gabaldon on the ground. *See* Lapel Video 4:33-5:10. Mr. Gabaldon was placed under arrest for allegedly driving under the influence of alcohol, in violation of NMSA 1978, § 66-8-102(D). *See* Defs.' UMF ¶ 41.

Mr. Gabaldon filed a complaint in state court on April 26, 2022. *See* Notice of Removal Ex. A, ECF No. 1. State Defendants removed the case to this Court on January 12, 2023. *Id.* Mr. Gabaldon's complaint alleges, among other things, that the actions of State Defendants constituted

---

[4] It was later discovered that the item Officer Smith believed was a knife was actually a loaded gun. *See* Lapel Video 5:18-5:51.

violations of his Fourth, Fifth, and Fourteenth Amendment rights. *See id.* Ex. A at 5. Specifically, he claims that Officer Smith did not have reasonable suspicion to conduct a traffic stop or probable cause to arrest Mr. Gabaldon, and that Officer Smith's use of force against Mr. Gabaldon was excessive and unreasonable. *See* Pl.'s Resp. 12-14.

State Defendants argue that they did not violate any of Mr. Gabaldon's clearly established constitutional rights and the court should grant qualified immunity to State Defendants for Mr. Gabaldon's Fourth Amendment claims. *See* Defs.' Mot. for Summ. J. 2, ECF No. 44. State Defendants also correctly note that Mr. Gabaldon's Fifth Amendment claim fails as a matter of law because he does not allege that he has been denied a jury trial or fair trial, subjected to double jeopardy, or denied any other rights protected by the Fifth Amendment. *See id.* If Mr. Gabaldon were alleging a Fifth Amendment due process or equal protection claim, such a claim would also fail as a matter of law because a Fifth Amendment due process or equal protection claim can only be brought against federal government actors, not state government actors like State Defendants. *See id.* at 20 (quoting *Doe v. Univ. of Denver*, 952 F.3d 1182, 1187 (10th Cir. 2020)). In response, Mr. Gabaldon concedes as much and withdraws his claim under the Fifth Amendment. *See* Pl.'s Resp. 14-15.

Similarly, State Defendants note that Mr. Gabaldon's Fourteenth Amendment claims would be inapplicable here because plaintiffs cannot also bring a substantive due process claim where a Fourth Amendment claim addresses the allegedly unconstitutional conduct. *See* Defs.' Mot. for Summ. J. 21-22 (quoting *Becker v. Kroll*, 494 F.3d 904, 919 (10th Cir. 2007)). In response, Mr. Gabaldon notes that his invocation of the Fourteenth Amendment does not apply to his Fourth Amendment claims, but rather his First Amendment claims. *See* Pl.'s Resp. 14-15.

Accordingly, the Court will only address the Fourth Amendment claims in this memorandum opinion and order.

## V.     LEGAL ANALYSIS FOR FOURTH AMENDMENT CLAIMS

### a.  Reasonable Suspicion to Conduct a Traffic Stop

The Fourth Amendment to the United States Constitution provides that the government shall not violate "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . . " U.S. Const. amend. IV. A "seizure" for the purposes of the Fourth Amendment occurs when a government actor terminates one's freedom of movement through means intentionally applied. *See Brower v. Cnty. of Inyo*, 489 U.S. 593, 596-97 (1989). Thus, a traffic stop is a seizure within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979).

A traffic stop is justified at its inception if it is "based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Callarman*, 273 F.3d 1284, 1286 (10th Cir. 2001) (quoting *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995)). While the government bears the burden to show the reasonableness of the officer's suspicion, reasonable suspicion is not meant to be an onerous standard. *See United States v. Kitchell*, 653 F.3d 1206, 1219 (10th Cir. 2011). To determine whether reasonable suspicion existed, a court must look objectively at the totality of the circumstances of which the officer was aware. *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002). An officer's subjective motivations are irrelevant to this inquiry. *See Whren v. United States*, 517 U.S. 806, 813-14 (1996). If an officer observes a traffic violation, then enough reasonable suspicion is formed to justify a traffic stop. *See United States v.*

*Winder*, 557 F.3d 1129, 1135 (10th Cir. 2009) ("Our precedents leave no room to doubt the validity of a traffic stop based on an observed traffic violation.").

Here, Officer Smith had a reasonable and objective basis to stop Mr. Gabaldon after he witnessed Mr. Gabaldon commit several traffic violations. First, Officer Smith saw Mr. Gabaldon make a wide right turn onto eastbound Candelaria Road and cross the double yellow lines into the westbound lane before correcting back into the proper lane. Officer Smith then used his speed radar to confirm that Mr. Gabaldon was driving 78 miles-per-hour in a 35 mile-per-hour zone. Finally, Officer Smith observed Mr. Gabaldon make a right turn onto Adams Street without using his turn signal. These traffic violations gave Officer Smith an articulable reasonable suspicion to conduct a traffic stop. *See Minafee v. Bernalillo Cnty. Bd. of Comm'rs*, 664 F. Supp. 3d 1283, 1298 (D.N.M. 2023) (finding officer had reasonable suspicion to conduct a traffic stop where officer reasonably believed seatbelt violation was occurring).

In response, Mr. Gabaldon alleges that Officer Smith's traffic stop was pretextual and self-serving. However, State Defendants correctly note that that an officer's subjective motives for stopping a vehicle are irrelevant to a court's analysis. *See United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995). Rather, the "sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated 'any one of the multitude of applicable traffic and equipment regulations' of the jurisdiction." *Id.* (quoting *Delaware v. Prouse*, 440 U.S. 648, 661 (1979)).

Accordingly, Mr. Gabaldon has not shown that State Defendants violated his Fourth Amendment rights when Officer Smith conducted the traffic stop, and State Defendants are entitled to qualified immunity and summary judgment on this claim.

**b. Probable Cause to Arrest**

The warrantless arrest of a person in a public place based on probable cause does not violate the Fourth Amendment. *United States v. Santana*, 427 U.S. 38, 42 (1976) (citing *United States v. Watson*, 423 U.S. 411 (1976)); *United States v. Davis*, 94 F.3d 1465, 1468 (10th Cir. 1996). Probable cause to support a warrantless arrest exists when the facts and circumstances within an officer's knowledge are sufficient to warrant a reasonable person to believe that the suspect had committed or was committing an offense. *See Beck v. Ohio*, 379 U.S. 89, 91 (1964). "[I]n determining whether probable cause exists, the courts must apply the 'totality of circumstances' test." *Brierley v. Schoenfeld*, 781 F.2d 838, 841 n.1 (10th Cir. 1986) (citing *Illinois v. Gates*, 462 U.S. 213 (1983)). A court examines the "events leading up to the arrest, and then decide[s] whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1220 (10th Cir. 2020). Probable cause is not a high bar. *Id.* (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)).

Observation of the facts in this case from the viewpoint of an objectively reasonable officer leads this Court to find that Officer Smith had probable cause to arrest Mr. Gabaldon for violating NMSA 1978, § 66-8-102(D). Section 66-8-102(D)(3) states that aggravated driving under the influence of intoxicating liquor or drugs includes the refusal "to submit to chemical testing, as provided for in the Implied Consent Act, and in the judgment of the court, based upon evidence of intoxication presented to the court, the driver was under the influence of intoxicating liquor or drugs." Several facts would lead a reasonable officer to believe Mr. Gabaldon was driving under the influence. To start, Officer Smith observed Mr. Gabaldon commit several traffic violations including speeding, crossing into the opposite lane of traffic, and turning without using a turn signal. Once Officer Smith approached Mr. Gabaldon, Mr. Gabaldon ignored Officer Smith's

command to move away from the residence and vehicle to have a conversation, he refused to tell Officer Smith his name, and he refused to cooperate more generally. Mr. Gabaldon then refused to participate in a standardized field sobriety test.

Further, Officer Smith smelled the odor of alcohol on Mr. Gabaldon and noticed that he had bloodshot, watery eyes, and was slurring his words during their conversation. Examining these observations and Mr. Gabaldon's uncooperative behavior from the viewpoint of an objective and reasonable officer leads the Court to find that there was probable cause for Officer Smith to believe that Mr. Gabaldon was driving while intoxicated and to arrest him.

In response, Mr. Gabaldon denies having slurred speech or bloodshot and watery eyes, citing to Officer Smith's lapel camera footage. *See* Pl.'s Resp. 13. However, the video footage is not clear enough to determine whether Mr. Gabaldon slurred his speech or had bloodshot and watery eyes. But even if the Court found this fact in favor of Mr. Gabaldon, it would not change the outcome as Mr. Gabaldon's several traffic violations, uncooperative behavior, and refusal to participate in a standardized field sobriety test, provided Officer Smith with sufficient probable cause to arrest him for driving under the influence.

Mr. Gabaldon argues that it was hard for him to hear Officer Smith's questions and commands because Mr. Gabaldon has a hearing impairment and Officer Smith spoke in a hurried and muffled fashion. *Id.* However, Officer Smith's lapel camera footage shows Mr. Gabaldon repeating Officer Smith's questions back to him and declining to answer them. *See* Lapel Video 1:55-5:10. Further, in determining whether an officer had probable cause to arrest a suspect, courts consider what knowledge the officer had at the time of the arrest. *Hinkle*, 962 F.3d at 1221 ("Temporally, we judge probable cause to arrest by what facts the officer knew at arrest."). At no point did Mr. Gabaldon tell Officer Smith that he could not hear his questions or commands. Nor

was there any reason for an objectively reasonable officer to believe that Mr. Gabaldon did not

hear the questions or understand what was going on. Rather, it appeared that Mr. Gabaldon was

consciously declining to answer certain questions or to follow certain commands.

Accordingly, Mr. Gabaldon has failed to show that his Fourth Amendment right to be free

from unlawful arrest was violated. Therefore, State Defendants are entitled to qualified immunity

and summary judgment on this claim.

### c.   Excessive Force Claim

A court's determination of whether a law enforcement officer used excessive force in the

context of an arrest or detention must be made using the Fourth Amendment's reasonableness

standard. *See Graham v. Connor*, 490 U.S. 386, 394 (1989). Courts review excessive force claims

using a standard of objective reasonableness, "judged from the perspective of a reasonable officer

on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396; *Pauly v. White*, 874 F.3d

1197, 1215 (10th Cir. 2017). Courts assess "objective reasonableness based on whether the totality

of the circumstances justified the use of force, and pay careful attention to the facts and

circumstances of the particular case." *Estate of Larsen ex. rel Sturdivan v. Murr*, 511 F.3d 1255,

1260 (10th Cir. 2008) (internal quotation marks omitted). In deciding whether an officer's actions

were objectively reasonable, courts balance three factors outlined by *Graham*: (1) the severity of

the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers

or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by

flight. *See Graham*, 490 U.S. at 396.

Under the first factor, the level of force used by an officer should be proportionate to the

severity of the crime. *See Donahue v. Wihongi*, 948 F.3d 1177, 1196 (10th Cir. 2020). For example,

a misdemeanor committed in a "particularly harmless manner . . . reduces the level of

force . . . reasonable for [the officer] to use." *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1281 (10th Cir. 2007).

The Tenth Circuit has noted that the second *Graham* factor—whether the suspect posed an immediate threat to the safety of the officers or others—is "undoubtedly the 'most important' and fact intensive factor in determining the objective reasonableness of an officer's use of force." *Pauly*, 874 F.3d at 1215-16 (quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)). Courts have held that an officer may use greater force "when a suspect is armed, repeatedly ignores police commands, or makes hostile motions towards the officer or others." *See Donahue*, 948 F.3d at 1196.

Under the third factor, a suspect must do more than simply ask questions or ask to be treated carefully to be considered actively resisting arrest. *See id.* Further, the level of force used by the officer must be proportionate to the level of resistance, if any, displayed by the suspect. *See Surat v. Klamser*, 52 F.4th 1261, 1275 (10th Cir. 2022) ("The level of [the suspect's] resistance—attempting to pry [the Officer's] fingers off of her arm and pawing at him—does not justify a severe use of force in response. . . . [The Officer's] use of force had to be proportionate.").

Here, the first *Graham* factor—the severity of the crime at issue—weighs in favor of Mr. Gabaldon. At the time of the arrest, Officer Smith suspected Mr. Gabaldon of driving while intoxicated, which would be viewed as a minor crime. *See Pauly*, 874 F.3d at 1215 n.5 (noting that "[u]nder New Mexico law, reckless driving and driving while intoxicated (first offense) are misdemeanor offenses").

However, the second and third *Graham* factors weigh in favor of Officer Smith and carry the day. First, Officer Smith noticed Mr. Gabaldon carrying and eventually reaching for a weapon

on his hip which Officer Smith believed to be a knife.[5] Further, Mr. Gabaldon appeared to be intoxicated, declined to answer Officer Smith's questions, and repeatedly ignored Officer Smith's commands to move away from the residence and the car. These facts could lead a reasonable officer to believe that the suspect posed an immediate threat, satisfying the second *Graham* factor. *See Gallegos v. City of Colorado Springs*, 114 F.3d 1024, 1031 (10th Cir. 1997) (holding officer's use of bar arm maneuver and take down of suspect was reasonable when suspect was acting strange and aggressive, and officer feared suspect would strike officer's partner with his free arm).

Then, Mr. Gabaldon resisted arrest by turning away from Officer Smith and holding onto the truck parked in the driveway. This is also when Officer Smith saw Mr. Gabaldon reach for what Officer Smith believed to be a knife. Mr. Gabaldon was physically resisting arrest, satisfying the third *Graham* factor.

To summarize: When Officer Smith decided to use force to arrest Mr. Gabaldon, Mr. Gabaldon had refused to answer Officer Smith's questions and had refused to follow Officer Smith's commands including to back away from the residence and truck. Mr. Gabaldon smelled of alcohol and had bloodshot eyes and slurred speech. Then, Mr. Gabaldon physically resisted arrest by grabbing for the truck, and he reached for something that Officer Smith believed to be a knife. The totality of the circumstances that Officer Smith observed leading up to this point, judged from the perspective of a reasonable and objective officer, justified his use of force in arresting Mr. Gabaldon.

In response, Mr. Gabaldon argues that Officer Smith rushed through his questions and did not afford Mr. Gabaldon time to respond to the questions or comply with his commands. *See* Pl.'s

---

[5] It was later discovered that the item Officer Smith believed was a knife was actually a loaded gun. But for purposes of this analysis, the Court will assume the weapon is a knife until the point at which Officer Smith discovers otherwise. *See Graham*, 490 U.S. at 396 (excessive force claims are "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight").

Resp. 14. However, the footage from Officer Smith's lapel camera clearly shows that Mr. Gabaldon had time to respond to Officer Smith's questions and commands; Mr. Gabaldon often repeated the questions back to Officer Smith before answering. *See* Lapel Video 2:12-4:30. Further, Mr. Gabaldon argues that Officer Smith used an unsanctioned "suplex" takedown when arresting Mr. Gabaldon. However, Mr. Gabaldon cites to no authority stating that this type of takedown is unsanctioned beyond claiming it is contrary to New Mexico State Police policy, and the Court could not find anything to support that claim on the record. Nonetheless, courts use a test of reasonableness when determining whether an officer used excessive force; a police department's policy may be considered within the reasonableness analysis, but it is not determinative. *See Graham v. Connor*, 490 U.S. 386, 396 (1989). Here, Officer Smith's takedown of Mr. Gabaldon was brief and limited to the purpose of handcuffing Mr. Gabaldon. *See* Lapel Video 4:42-5:45. Lieutenant Ward helped Mr. Gabaldon stand up as soon as he and Officer Smith had secured him with handcuffs and confiscated his gun, about a minute after the initial takedown. *See id.*

Accordingly, judged from the perspective of a reasonable officer, the totality of the circumstances justified Officer Smith's use of force. Mr. Gabaldon's Fourth Amendment rights were not violated, and State Defendants are entitled to qualified immunity and summary judgment on this claim.

## VI.   CONCLUSION

Because Mr. Gabaldon cannot show that any of his Fourth Amendment rights were violated by State Defendants, the Court will grant summary judgment on each claim on the basis of qualified immunity.

**IT IS HEREBY ORDERED** that *State Defendants' Motion for Partial Summary Judgment on Plaintiff's Fourth, Fifth, and Fourteenth Amendment Claims* **(ECF No. 44)** is **GRANTED**, and State Defendants are entitled to qualified immunity on Plaintiff's claims. Mr. Gabaldon's Fourth and Fifth Amendment claims are **DISMISSED WITH PREJUDICE** and Mr. Gabaldon's Fourteenth Amendment claims are **DISMISSED WITH PREJUDICE** as applied to his Fourth and Fifth Amendment claims. The Court reserves judgment of Mr. Gabaldon's Fourteenth Amendment claims as applied to his First Amendment claims**.**


_____
SENIOR UNITED STATES DISTRICT JUDGE